**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

**v.**

**STATE OF MISSOURI, DEPARTMENT OF SOCIAL SERVICES, DIVISION OF CORRECTIONS, Defendant.**

**Lessye HAWKINS–SIMPSON, Plaintiff,**

**v.**

**STATE OF MISSOURI, DEPARTMENT OF SOCIAL SERVICES, DIVISION OF CORRECTIONS, Defendant.**

**Nos. 83–1971 C (2), 84–1383 C (2).**

United States District Court, E.D. Missouri, E.D.

July 12, 1985.

C. Felix Miller, E.E.O.C.—St. Louis District Office, St. Louis, Mo., for plaintiff.

Frank A. Anzalone, Clayton, Mo., for plaintiff-intervenor Lessye Hawkins-Simpson.

James C. Martin, Chief Legal Counsel, Dept. of Corrections and Human Resources, Melinda Corbin, Mary Stewart Tansey, Asst. Attys. Gen., Jefferson City, Mo., for defendant.

## MEMORANDUM AND ORDER

FILIPPINE, District Judge.

This matter is before the Court for a decision on the merits following trial to the Court. After consideration of the pleadings, the testimony and exhibits introduced at trial, the parties' briefs, and the applicable law, the Court enters the following memorandum which it adopts as its findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

On August 12, 1983, the EEOC brought suit against defendant to enforce the Equal Pay Act, 29 U.S.C. § 206(d), in Cause Number 83–1971C(2). On June 13, 1984, Hawkins-Simpson brought suit against defendant in Cause Number 84–1383C(2), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for alleged discrimination based on race and/or sex.

On June 26, 1984, the parties consented to consolidation of the cases and waived their right to a jury trial. A trial on the merits was held on November 19, 20 and 21, 1984.

The parties have entered into the following Joint Stipulation of Facts.

## JOINT STIPULATION OF FACTS

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 16(c) and 17 of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* (hereinafter referred to as the "FLSA"), to enforce the Equal Pay Act requirements stated in Section 6(d) of the FLSA, 29 U.S.C. § 206(d).

2. Plaintiff Equal Employment Opportunity Commission (hereinafter the "Commission") is an agency of the United States of America charged with the administration, interpretation and enforcement of the equal pay requirements of the FLSA and is expressly authorized to bring this action by Sections 16(c) and 17 of the FLSA, 29 U.S.C. §§ 216(c) and 217, as amended by Section 1 of Reorganization Plan No. 1 of 1978, 92 Stat. 3781, and by Public Law 98–532 (1984), 98 Stat. 2705.

3. Since May 1, 1974, defendant, State of Missouri, Department of Social Services, Division of Corrections (hereinafter referred to as "Division of Corrections"), has continuously been and is now a public agency within the meaning of Section 3(x) of the FLSA, 29 U.S.C. § 203(x), in that it is the government of the State of Missouri and is engaged in the operation of the Criminal Corrections Systems for the State of Missouri.

4. Since May 1, 1974, the Division of Corrections has at all times acted directly and indirectly in the interest of an employer in relation to its employees who performed and are performing work at the St. Mary's Honor Center, and is and was thus an employer of employees within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

5. The Division of Corrections operates the St. Mary's Honor Center as a correctional facility in the City of St. Louis, Missouri.

6. Since May 1, 1974, the Division of Corrections has continuously employed and now employs employees in commerce or in the production of goods for commerce within the meaning of Section 3(b), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (i) and (j).

7. Since May 1, 1974, the Division of Corrections has continuously been and is now engaged in related activities performed through unified operation or common control for a common business purpose, and has continuously been and is now an enterprise within the meaning of Section 3(r)(3) of the FLSA, 29 U.S.C. § 203(r)(3).

8. Since May 1, 1974, the Division of Corrections has continuously been and is now an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(6) of the FLSA, 29 U.S.C. § 203(s)(6), in that said enterprise has continuously had and does now have employees engaged in commerce or in the production of goods for commerce, including employees handling or otherwise working on goods or materials that have been moved in or produced for commerce, and in that said enterprise is an activity of a public agency.

9. Mr. Mortimer J. Reilly is a male, who was employed in the position of Executive I at St. Mary's Honor Center from March 12, 1980, to January 31, 1981.

10. Ms. Lessye Hawkins-Simpson is a female, who has been employed in the position of Executive I at St. Mary's Honor Center from March 12, 1981, to the present.

11. The duties performed by Mr. Reilly as Executive I consisted of managing the St. Mary's Honor Center's business office, which required the supervision of an account clerk, a clerk-typist, and the food service staff of three cooks. It also required the purchasing of supplies for the Center, which included: determining what purchases were needed, making those purchases by state contract procedures, ensur-

ing that the state was properly billed and properly paid its bills, and working with vendors to assure that the state was provided the services and goods it contracted for. It also required keeping the books of the inmate accounts.

12. The duties of the Executive I when Ms. Hawkins-Simpson was promoted to the position were identical to those when Mr. Reilly held the position. They have remained unchanged since Ms. Hawkins-Simpson began as Executive I, with the exception of a gradual increase in the budget of St. Mary's Honor Center, and an increase in the inmate population, which has required a greater volume of purchasing and more bookkeeping for the inmate accounts.

13. During their employment as Executive I at St. Mary's Honor Center, both Mr. Reilly and Ms. Hawkins-Simpson worked at the same office at 1458 Papin Street, St. Louis, Missouri, and under the same working conditions.

14. Mr. Mortimer J. Reilly, while employed as an Executive I at St. Mary's Honor Center was subject to Basic Compensation Plan "A" used by the Division of Corrections and was initially placed at range 15, step E of that plan upon his hire on March 12, 1980.

15. While compensated at the range 15, step E salary level, Mr. Reilly received $1,057.00 per month. On July 1, 1980, Mr. Reilly received a salary adjustment to $1,136.00 a month.

16. Pursuant to the Basic Compensation Plan A, Mr. Reilly received a one step increase to range 15, step F, upon the completion of his probationary period on January 14, 1981.

17. While compensated at the range 15, step F salary level, Mr. Reilly received $1,186.00 per month, until he left the employ of the State of Missouri on January 31, 1981.

18. Ms. Lessye Hawkins-Simpson, while employed as an Executive I at St. Mary's Honor Center, was subject to the Basic Compensation Plan "A" and was initially placed on March 12, 1981, at range 15, step C of that plan, thereby receiving a monthly salary of $1,043.00 until September 12, 1981. The monthly salary for the range 15, step E salary level was $1,136.00 per month for this time period.

19. Ms. Hawkins-Simpson, pursuant to the Basic Compensation Plan A, received a one step increase upon the completion of her probationary period on September 12, 1981, to the range 15, step D level and thereafter received a monthly salary of $1,088.00 until July 1, 1982. The monthly salary for the range 15, step F salary level was $1,186.00 per month for this period of time.

20. Had Ms. Hawkins-Simpson been originally placed at the range 15, step E salary level upon her promotion to Executive I, her step increase on September 12, 1981, would have placed her at the range 15, step F salary level.

21. On July 1, 1982, Ms. Hawkins-Simpson received a salary adjustment to $1,149 per month. She received that salary until August 1, 1982. Thereafter she received a one step increase in pay to range 15, step E for her satisfactory completion of one year of service at the range 15 pay level. Her new salary was $1,197.00 per month until July 1, 1983.

21a. On July 1, 1982, the Basic Compensation Plan A was replaced by the Revised Basic Compensation Plan, which increased salary steps by 1% plus $.50 per month costs of living adjustment.

22. Had Ms. Hawkins-Simpson been originally placed at the range 15, step E salary level upon her promotion to Executive I, her step increase on August 1, 1982, would have placed her at the range 15, step G level of the Revised Basic Compensation Plan.

23. The monthly salary for an employee at the range 15, step G level on the Revised Basic Compensation Plan salary scale as of July 1, 1982, was $1,300.00 and remained at that rate until at least July 1, 1983.

24. Ms. Hawkins-Simpson, pursuant to the repositioning of the Executive I classifi-

cation within the Revised Basic Compensation Plan, was placed at the range 16, step E level on July 1, 1983. Her new monthly salary at this level was $1,268.00, which she received until July 1, 1984.

25. Had Ms. Hawkins-Simpson been originally placed at the range 15, step E salary level upon her promotion to Executive I, the repositioning of the Executive I classification would have placed her at the range 16, step G level on the Revised Basic Compensation Plan salary scale.

26. The monthly salary for an employee at the range 16, step G level on the Revised Basic Compensation Plan as of July 1, 1983, was $1,357.00 and remained at that rate until July 1, 1984.

27. Ms. Hawkins-Simpson, pursuant to a general cost of living salary increase, received a salary increase on July 1, 1984, to $1,357.00 per month which she has continuously received thereafter.

28. Had Ms. Hawkins-Simpson been originally placed at the range 15, step E salary level upon her promotion to Executive I, her salary level on July 1, 1984, would have been at the range 16 step G salary level of the Revised Basic Compensation Plan.

29. Since July 1, 1984, the monthly salary for an employee at the range 16, step G salary level has been and remains at $1,473.00.

30. Mr. Reilly had not been employed by the State of Missouri or the Division of Corrections prior to his hire as Executive I at St. Mary's Honor Center and thus his placement at the range 15, step E salary level upon his hire was not based upon his prior job performance with the State of Missouri.

31. Ms. Hawkins-Simpson had not been employed as an Executive I by the Division of Corrections prior to her promotion to that position on March 12, 1981, and thus her initial placement at the range 15, step C salary level was not based upon her prior job performance in the Executive I position.

32. Plaintiff's Exhibit 10 is the Certification List prepared for the vacancy of the Executive I position at St. Mary's Honor Center, which was filled by Lessye Hawkins-Simpson.

33. Pamela S. Buchta (now Kelley) was one of the candidates appearing on Plaintiff's Exhibit 10. She declined an interview for the position because she did not wish to move to St. Louis at that time and did not want to work at a correctional facility. Accordingly, she was not available to fill that vacancy.

34. Louise A. Swain was one of the candidates appearing on Plaintiff's Exhibit 10. She declined an interview for the position because she did not want to move to St. Louis. Accordingly, she was not available to fill that vacancy.

35. The Division of Corrections must fill vacant positions from a Personnel Requisition and Certification for the position prepared by the State of Missouri Personnel Division. To be eligible for hire for a vacant position, an applicant's name must appear on the Certifications for the position. Applicants whose names appear on a Certification List for a position are qualified for that position.

36. From March 12, 1981, to September 12, 1981, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 15, step E rate, would have been $558.00 more than the salary actually paid to her over that period when she was paid at the range 15, step C rate.

37. From September 12, 1981, to July 1, 1982, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 15, step F rate, would have been $940.80 more than the salary actually paid to her over that period when she was paid at the range 15, step D rate.

38. From July 1, 1982, to July 1, 1983, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 15, step G rate would have been $1,236.00 more than the salary actual-

ly paid to her over that period, when she was paid at the range 15, step E rate.

39. From July 1, 1983, to July 1, 1984, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 16, step G rate, would have been $1,308.00 more than the salary actually paid to her over that period when she was paid at the range 16, step E rate.

40. From July 1, 1984, to November 19, 1984, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 16, step G rate, would have been $537.46 more than the salary actually paid to her over that period when she was paid at the range 16, step E rate.

41. The Division of Corrections officials, Arthur Schulte, Superintendent of St. Mary's Honor Center, and Donald Gerling, Chief of Fiscal Management, and Dale Witte, Director of Division of Finance of the Department of Social Services, were aware of the Equal Pay Act, 29 U.S.C. § 206(d) and that it applied to the Division of Corrections.

42. Ms. Hawkins-Simpson's first written complaint about her pay being lower than what Mr. Reilly's had been was made to Arthur J. Schulte, Superintendent at St. Mary's Honor Center, on May 28, 1981. In it Ms. Hawkins-Simpson specifically protested that she was not receiving equal pay for equal work.

43. Ms. Hawkins-Simpson filed an Equal Pay charge with the United States Equal Employment Opportunity Commission on February 8, 1982, and the Division of Corrections was notified of that charge by letter mailed on February 26, 1982.

44. The United States Equal Employment Opportunity Commission issued a Letter of Violation in regard to Ms. Hawkins-Simpson's Equal Pay Act charge on December 10, 1982, which was received by the Division of Corrections on December 14, 1982.

45. All exhibits are authentic.

### Equal Pay Act

■ In order to make a prima facie case under the Equal Pay Act (EPA), 29 U.S.C. § 206(d)(1), plaintiffs have the burden of showing that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' " *Corning Glass Works v. Brennan, Secretary of Labor*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). *Horner v. Mary Institute*, 613 F.2d 706, 713 (8th Cir. 1980). There are, however, four exceptions to compliance with the Act: where "payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures work by quantity or quality of production; or (iv) a differential based on any other factor than sex." 29 U.S.C. § 206(d)(1). Once plaintiffs have carried their burden and made a prima facie case, the burden is then shifted to the defendant to show that one of the Act's four exceptions apply. *Corning Glass Works, supra*, 417 U.S. at 196, 94 S.Ct. at 2229; *Horner, supra*, 613 F.2d at 713.

Defendant first argues, contrary to its earlier statements contained in its pre-trial material, that plaintiffs have failed to make a prima facie case. The basis of their argument is the testimony of Dale Witte, one-time director of the Division of Finance for the Department of Social Services of the State of Missouri. Witte testified that Reilly was never an employee of defendant, but was exclusively employed by the Division of Finance which paid his wages (Tr. 2–156). Hawkins-Simpson, he testified, was employed by the Division of Finance when promoted to the Executive I position (Tr. 2–160). Thereafter, as part of a reorganization plan, defendant Division of Corrections was made a separate Department of Corrections, Human Resources (Tr. 2–164) and Hawkins-Simpson's job was transferred to the new Department of Corrections (Tr. 2–165–166). Thus defendant argues that plaintiffs have failed to demonstrate that Hawkins-Simpson and Reilly were both paid by defendant thereby having failed to make a prima facie case.

**1158**

■ In the context of the EPA " 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee...". 29 U.S.C. § 203(d). The term employer has been interpreted broadly, *Donovan v. Agnew*, 712 F.2d 1509 (1st Cir.1983); *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.1983), and an employee may have more than one employer at a given time. *Donovan, supra*, 712 F.2d at 1509–10; *Bonnette, supra*, 704 F.2d at 1469. The evidence presented at trial establishes that both Reilly and Hawkins-Simpson before the departmental reorganization had as their employers both the Division of Finance and the Division of Corrections. Although the Division of Finance had ultimate authority over the Executive I position and was responsible for paying those who filled those positions, " 'a consideration of the total employment situation and the economic realities of the work relationship,' " *Bonnette, supra*, 704 F.2d at 1470, convince the Court that defendant also stood as an employer of both Reilly and Hawkins. Factors considered in reaching this conclusion include:

"whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." In varying combinations, these factors have been considered by other courts for the same purpose. *See, e.g., [Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 756 (9th Cir. 1979) ]; *Hodgson v. Griffin and Brand of McAllen, Inc.*, [471 F.2d 235, 237–38 (5th Cir.1973) ].

*Id.*

The facility within the Division of Corrections at which the Executive I worked, in this case St. Mary's Honor Center (SMHC), determined Reilly's and Hawkins-Simpson's job duties with Witte's approval (Tr. 2–158). Evaluation of their performance was initially performed by the Superintendent of SMHC (Tr. 2–158), and then reviewed on occasion by Witte (Tr. 2–159). The Super-

intendent at SMHC made the decision to hire someone for the Executive I position (Witte depo. 25–26, 35), although ultimate approval of the appointment came from Witte, who did not undertake independent assessment of the applicant's qualifications (Tr. 2–168). Thus, consideration of "the total employment situation," *Bonnette, supra*, 704 F.2d at 1470, leads one to the conclusion that the Division of Corrections was the employer of both Reilly and Hawkins-Simpson.

■ Defendant, however, argues that even though the Division of Corrections was the employer of both, it did not pay both and thus cannot be responsible for their unequal pay. In essence, it appears that defendant argues that plaintiffs have sued the wrong party. However, the Department of Labor's regulations in this regard state that

[i]f the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the act. *In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act,* including the overtime provisions, with respect to the entire employment for the particular workweek.

29 C.F.R. § 791.2(a) (footnote omitted) (emphasis added). Thus, the regulation makes clear that once it is determined that one is a joint employer of an employee the joint employer is responsible for compliance with the EPA. Accordingly, the Division of Corrections is properly a party to this lawsuit and plaintiffs have made a prima facie case as is evident from the stipulations which indicate that both Reilly and Hawkins performed the exact same job, but Reilly was paid more. *See Corning Glass Works, supra*, 417 U.S. at 195, 94 S.Ct. at 2228; *Horner, supra*, 613 F.2d at 713.

■ Nevertheless, defendant argues that it has not violated the EPA because the payment of higher wages to Reilly was determined in accordance with a merit system or was based on a factor other than sex, both of which are exceptions to the EPA, 29 U.S.C. § 206(d)(1)(ii) and (iv). Plaintiffs first argue that the merit system defense is available only if the salaries of both Hawkins-Simpson and Reilly were based upon their job performance in the Executive I position. Plaintiffs cite as authority for this proposition both the legislative history of the EPA and a number of cases wherein the applicability of the merit system defense was based on the actual job performance. See Plaintiffs' post-trial brief at 3–4. The Court has found no cases wherein the issue has been addressed and, in fact, found only one case in which the issue was recognized.[1] However, in light of congressional intent that the exceptions to the Act be narrowly construed, *EEOC v. Aetna Insur. Co., supra,* 616 F.2d at 724; *EEOC v. McCarthy,* 578 F.Supp. 45, 47 (D.Mass.1983), the Court agrees with plaintiffs that the merit system defense is not applicable unless the merit system utilized is based on employee performance on the job. The legislative history supports this view. In the Senate Labor Committee's Report on the EPA the committee stated with regard to the merit system defense:

> Similarly, a merit system or piecework system which measures either the quantity or quality of production or performance can result in far greater gross earnings by one person compared to another, even though both are technically doing the same type of work. Obviously, such systems which measure quantity or quality of production or performance will be valid exceptions to the equal-pay requirements.

S.Rep. No. 176, 88th Cong. 1st Sess. (1963). Said comments indicate that a merit system is used to measure an employee's quantity or quality of performance. Such a system necessarily requires that the employee has done work for the employer in a given position which can be assessed. Representative Green's comments during congressional debate on the proposed Findley amendment to the Act, which would allow wage differentials for heads of families, reflect a similar belief: "This is based on merit, *on work that is performed,* rather than on other factors." 88th Cong. 1st Sess., Cong.Rec. 8695 (House, May 23, 1963).[2]

■ This construction of the statute in no way precludes an employer from paying one newly hired employee more than another newly hired employee where the one has qualifications which are clearly superior to those of the other. Such a wage differential is authorized under the factor other than sex exception to the EPA, 29 U.S.C. § 206(d)(1)(iv). *See Horner v. Mary Institute,* 613 F.2d 706, 714 (8th Cir.1980). *See also, Kouba v. Allstate Insurance Company,* 691 F.2d 873, 876 (9th Cir.1983); *EEOC v. Aetna Insurance Company, supra,* 616 F.2d at 725; *Craft v. Metromedia, Inc.,* 572 F.Supp. 868, 879 (W.D.Mo.1983), *aff'd in relevant part, rev'd in part,* 766 F.2d 1205 (8th Cir.1985). This is precisely the argument made by defendant herein. De-

---

1. In *EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 725–26 (4th Cir.1980), the Fourth Circuit stated in dicta as follows:

   Reading the legislative history provides some indications that references to "a merit system" contemplated an arrangement applicable only to existing employees. We are not certain that such was the intention, but it is not necessary to decide whether a compensation system for new employees falls within the statutory exception for a merit system. Even assuming that Aetna's scheme for compensating Archer, as a new employee, was not a "merit system", we are nevertheless satisfied that the pay differential was not based on sex.

2. The Court's finding, below, that Reilly did not possess superior qualifications justifying the higher salary would also eliminate any merit system defense of defendant were it available to it. Defendant argues that under the merit system it was authorized to pay Reilly more *if he had superior qualifications.* See defendant's post-trial brief at 12–13. Because defendant has not shown that Reilly had superior qualifications, even if the merit system defense were available to it, defendant has not established the affirmative defense.

fendant argues that Reilly's qualifications for the Executive I position were such that, coupled with an alleged recruitment problem, his higher starting salary was justified. The Court, however, finds that defendant has failed to show that Reilly had such superior qualifications justifying the higher salary and that it did not show the existence of a recruitment problem.

With regard to Reilly's qualifications as compared to those of Hawkins-Simpson they clearly could not be described as superior. Leigh Wayne, defendant's human relations officer, testified that the qualifications of both were comparable (Tr. 1–150– 151). Don Gerling, one of the hiring officials (Tr. 1–206), admitted that Hawkins-Simpson was at least as well qualified as Reilly (Tr. 2–211–212) and was superior to him with respect to bookkeeping and accounting skills (Tr. 1–220–221). He also indicated that Hawkins-Simpson was a person of greater ability and responsibility than Reilly in the handling of inmate accounts (Tr. 1–220). Gerling expressed concerns about Reilly's qualifications for the Executive I position (Exh. 5, Tr. 1–195, 1–208). He expressed no such concerns about Hawkins-Simpson's qualifications and thought she would do a satisfactory job (Exh. 9, Tr. 1–196, 2–209). Both Reilly and Hawkins-Simpson received the same merit test score (Exh. 3, Exh. 10). Reilly's strengths were in meeting the public and in his knowledge of purchasing (Tr. 2–207– 208). There is no evidence that Hawkins-Simpson was weak in these areas. The Court finds it difficult to believe that Reilly's strength in these two areas justified the pay differential in the Executive I position which consisted primarily of purchasing, budgeting, supervision of employees and of the inmate banking system (Tr. 1– 43). This is especially true in light of Hawkins-Simpson's clearly superior training in accounting and her prior experience in supervising employees and dealing with people.

Similarly, a comparison of Reilly's qualifications as set forth in his employment application to those of Hawkins-Simpson further demonstrate that his qualifications were not superior to Hawkins-Simpson's qualifications. Reilly had never worked for the State of Missouri or at SMHC when hired (Joint Stip. 30) and thus was not as familiar with state procedures as was Hawkins-Simpson who had one year of experience at SMHC in the very position she would be expected to supervise (Tr. 1–32). Although Reilly's application reflects some twenty years of experience in a supervisory capacity (Exh. 2), he had been unemployed for the four years prior to the time he was hired (Tr. 2–204). Hawkins-Simpson had over nine years of supervisory experience (Tr. 1–29–30) and had performed accounting work for over twelve years (Tr. 1–29– 30). Reilly's educational background was in speech (Exh. 2), while Hawkins-Simpson had taken college courses in financial and management accounting, algebra, psychology and sociology (Tr. 1–26), and had taken a ten week course on supervision provided by a previous employer (1–26–27). Again, these facts provide no basis for the conclusion that Reilly's qualifications were superior to those of Hawkins-Simpson and the Court, therefore, concludes that Reilly's qualifications were not superior to those of Hawkins-Simpson and thus do not constitute a defense to plaintiffs' prima facie case.

The Court further notes that defendant's assertions of a recruitment problem to justify the higher salary have no basis in fact. Defendant asserts that because Reilly was the only qualified person for the job and he demanded a higher salary, the higher salary is justified as being based on a factor other than sex under 29 U.S.C. § 206(d)(iv). The evidence presented, however, shows that at the time Reilly was hired there were other qualified candidates for the job. J.T. Vanhorn, Jr., testified that he had applied for the job, that he had been interviewed for it and that, had it been offered to him, he would have accepted the position at the entry salary (Tr. 2–2–6). At trial both selecting officials, Arthur Schulte and Donald Gerling, first could not recall why Vanhorn was not offered the position (Tr. 2–34, 2–35, 1–200, 1–201). Gerling, how-

ever, later testified, after seeing Vanhorn in court, that Vanhorn was not hired because he was of the opinion that Vanhorn was incapable of dealing with inmates (Tr. 2–182). This, of course, would be a legitimate reason not to consider someone qualified for a position at a correctional facility which position concerns the handling of inmate accounts. On this point, however, the Court questions Gerling's credibility, finding it difficult to believe that after seeing Vanhorn, who Gerling only interviewed for five minutes to one hour, for the first time in four and one-half years his memory was so refreshed that he remembered the precise reason for not hiring him.

In addition to Vanhorn, one Jerry L. Smith was also available and willing to accept the Executive I position at the entry level salary (Tr. 2–10–11). Smith, however, was never offered the position (Tr. 2–50). The reason advanced by Schulte at trial was Smith's poor performance as an Account Clerk II at SMHC (Tr. 2–50). Schulte's explanation is not credible given Smith's performance rating of "Outstanding" while an Account Clerk II at SMHC (Exh. 29, Exh. 30), especially when these evaluations were reviewed and approved by Schulte himself (Exh. 29, p. 2; Exh. 30, p. 2; Tr. 2–217, 2–219). Defendant has thus failed to show the existence of a recruitment problem for the Executive I position at SMHC.

In summary, after a careful review of the facts and the applicable law, the Court finds that plaintiffs herein have made a prima facie case that defendant has violated the Equal Pay Act and that defendant has failed to rebut that case.

### Title VII

■ Plaintiff Hawkins-Simpson's Title VII claim arises out of essentially the same facts as the EEOC's Equal Pay Act claim. Hawkins-Simpson alleges that she was denied equal pay for performing the same job

as Reilly on the basis of her race and/or her sex.

Title VII and the Equal Pay Act must be construed in harmony. *DiSalvo v. Chamber of Commerce of Greater Kansas City,* 568 F.2d 593, 596 (8th Cir.1978). Although plaintiff has brought suit under the Equal Pay Act as well as title VII, our basic analysis is essentially the same under either theory. To show a prima facie case, [plaintiff] must prove she performed substantially equal work as [Reilly] but was paid less for it. *Strecker v. Grand Forks County Social Service Board,* 640 F.2d 96, 99–100 (8th Cir.1980) (footnote omitted). *See also Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir.1981); *Heymann v. Tetra Plastics Corp.,* 640 F.2d 115, 120 (8th Cir.1981). As above discussed, plaintiffs have made a prima facie case by showing that Hawkins-Simpson performed the same job as Reilly but was paid less for it. Further, defendant has failed to articulate a legitimate non-discriminatory reason for the pay differential as is required in Title VII cases. *See McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). As discussed above, defendant has not established any of the EPA defenses, which Title VII incorporates, *Strecker, supra,* 640 F.2d at 99–100, n. 1; nor has defendant advanced any additional nondiscriminatory reason for the unequal pay. Thus defendant's actions also constitute a violation of Title VII.[3]

### Damages

■ Plaintiffs pray for the following: (1) an injunction enjoining defendant from further violation of the Equal Pay Act, (2) back wages to be paid to plaintiff Hawkins-Simpson and an equal amount as liquidated damages, (3) an order to provide Hawkins-Simpson a prospective wage increase in an amount sufficient to attain her rightful place on the appropriate pay scale; and (4) the costs of this action. Plaintiff Hawkins-Simpson further prays for reasonable at-

---

**3.** In her complaint Hawkins-Simpson also alleges discrimination on the basis of race. No evidence has been presented which would lead the Court to conclude that the pay differential was the result of racial discrimination.

torneys' fees pursuant to 42 U.S.C. § 2000e–5(K).

29 U.S.C. § 216(b) requires an award of back pay for violations of the Equal Pay Act. The parties herein have stipulated that from March 12, 1981, to September 12, 1981, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 15, step E rate, the level at which Reilly was placed when originally hired, would have been $558.00 more than the salary actually paid to her over that period when she was paid at the range 15, step C rate (Joint Stip. 36). From September 12, 1981, to July 1, 1982, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 15, step F rate, would have been $940.80 more than the salary actually paid to her over that period when she was paid at the range 15, step D rate (Joint Stip. 37). From July 1, 1982, to July 1, 1983, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 15, step G rate would have been $1,236.00 more than the salary actually paid to her over that period, when she was paid at the range 15, step E rate (Joint Stip. 38). From July 1, 1983, to July 1, 1984, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 16, step G rate, would have been $1,308.00 more than the salary actually paid to her over that period when she was paid at the range 16, step E rate (Joint Stip. 39). From July 1, 1984, to November 19, 1984, the total salary that would have been paid to Lessye Hawkins-Simpson had she been at the range 16, step G rate, would have been $357.46 more than the salary actually paid to her over that period when she was paid at the range 16, step E rate (Joint Stip. 40). Thus, the amount of back wages due until November 19, 1984, is $4,580.26. In addition, plaintiff is due in back wages an amount of $45.23 per day from November 19, 1984, to the date of entry of judgment.

Plaintiffs also request liquidated damages in the same amount. Liquidated damages, however, are not awarded as a matter of right even though 29 U.S.C. § 216(b) would seem to so indicate.

By its terms, 29 U.S.C. § 216(b) requires that liquidated damages be awarded as a matter of right for violations of the FLSA. However, in response to its dissatisfaction with that judicial interpretation of the provision, Congress enacted the Portal-to-Portal Pay Act of 1947, 61 Stat. 84, which, *inter alia*, grants courts authority to deny or limit liquidated damages where the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of" the FLSA, § 11, 29 U.S.C. § 260 (1970 ed., Supp. V).

*Lorillard, A Division of Loew's Theatres, Inc. v. Pons,* 434 U.S. 575, 583–84 n. 11, 98 S.Ct. 866, 871–72 n. 11, 55 L.Ed.2d 40 (1978). The Court, however, is not satisfied that defendant herein acted in good faith in paying Hawkins-Simpson less than Reilly. Hawkins-Simpson several times attempted to resolve the matter through various channels within the department (Tr. 1–45–52). These attempts were made immediately upon receipt of her first paycheck (Tr. 1–46). She received little, if any, response by her superiors. Further, the Court does not find it credible that defendant in good faith believed it could justify Reilly's higher salary on the basis of his qualifications and/or a recruitment problem. Accordingly, the Court will award liquidated damages in an amount equal to plaintiff's back pay award. 29 U.S.C. § 216(b).

The only issue remaining before the Court is plaintiff Hawkins-Simpson's claim for attorney's fees which the parties agreed at trial to bifurcate. Judgment on the merits will not be entered, however, until the attorney's fees claim has been determined, at which time a single final judgment determining all issues will be entered.

Accordingly,

IT IS HEREBY ORDERED that the plaintiff Hawkins-Simpson shall submit within ten days of the date of this order affidavits and other appropriate materials on the issue of her attorneys' fees and defendant shall have ten days from the filing thereof to respond thereto.